HOOVER STEEL BALL COMPANY

*v.*

SCHAFER BALL BEARINGS COMPANY.

[Decided October 25th, 1918.]

1. The sixty-fourth section of the Corporation act (*2 Comp. Stat. p. 1638*), forbidding transfers when insolvent, &c., applies to a foreign corporation doing business in this state.

2. Actual suspension of business as used in section 64 imports more than a mere failure to meet maturing obligations as they accrue; the words contemplate an interruption of ordinary business operations evidenced by some objective features; an interruption of the ordinary course of business other than a mere failure to meet maturing obligations.

3. "Insolvent," as used in the sixty-fourth section, must be defined the same as "insolvent," as used in the sixty-fifth section—that is, a corporation is insolvent when there is a general inability to meet pecuniary liabilities as they mature by means of either available assets or an honest use of credit.

4. A corporation may, if temporarily in need of funds, pledge its assets if by the pledge of such assets moneys may be raised which will relieve it of its embarrassment and permit it to continue.

5. Before a corporation insolvent, in the sense of laboring under a general inability to pay maturing obligations, can make, for a present advance, a valid pledge of its assets to a person having knowledge of the

434      CASES IN CHANCERY, 1918.

Hoover Steel Ball Co. *v.* Schafer Ball Bear. Co.    *89 N. J. Eq.*

condition, it must at least appear that the pledge is in pursuance of some financial scheme which it is reasonable to suppose will result in placing the corporation in a position of solvency as contemplated by the statute.

6. Distinction between general inability to meet maturing obligations and a temporary embarrassment.

On bill, &c.

*Messrs. Bilder & Bilder* (*Mr. David H. Bilder*), for the receiver.

*Mr. Benjamin F. Jones* and with him *Mr. Porter* (of the New York bar), for the estate of Daniel H. Tolman.

LANE, V. C.

Defendant, a New York corporation, on or about August 28th, 1917, made and delivered in New York to one Tolman two sixty-day collateral notes, one for $1,700 and the other for $2,700, payable in New York. At or about the same time it delivered to Tolman, as collateral, two negotiable warehouse receipts covering approximately forty-five thousand pounds of steel. It received from Tolman upon the notes a total of $4,134.65. Shortly thereafter, on or about September 11th, the corporation gave Tolman a sixty-day chattel mortgage for $5,000, on its machinery and equipment at its plant at Hawthorne, N. J., securing a note for $5,000. There was advanced upon this loan approximately $4,300. When the two collateral notes became due, on or about October 27th, 1917, a new note dated October 27th, 1917, for $5,800, payable in ninety days, was made and delivered by the corporation to Tolman, in New York. The two notes made in August were canceled. Three thousand pounds of steel in storage were released. As a part of the same transaction a new chattel mortgage for $6,000 was made and executed by defendant and delivered to Tolman and the chattel mortgage for $5,000 was canceled. This $6,000 chattel mortgage was payable at the rate of $500 per month. Tolman at this time advanced $300 in cash and subsequently a sum which has been stated to be either $500 or $700, making the aggregate additional advance $800 or $1,000. There was

endorsed upon the note dated October 27th, 1917, for $5,800, a payment of $420. This payment was, in fact, never made and the reason for the endorsement upon the note is not clear. All of the transactions took place in New York. On the 24th day of May, 1918, in proceedings instituted under the statute, a receiver of defendant was appointed by this court. Both the Tolman estate (Tolman having died) and the receiver claiming the steel, it was sold and the proceeds brought within the control of the court. The insistence of the receiver is that the pledge of the steel is void under the provision of section 64 of an act concerning corporations, revision of 1896 (*2 Comp. Stat. p. 1638*). He rests his claim upon two propositions—*first,* that at the time of the pledge the corporation was insolvent within the meaning of the statute to the knowledge of Tolman; *second,* that the company had, at the time of the pledge, "actually suspended its ordinary business," and it appearing that the company was insolvent at the time of the pledge, knowledge to Tolman is immaterial. The Tolman estate insists that the transactions being consummated in New York and the corporation being a New York corporation, the law of New York applies, and it appearing that the pledge was not made for the purpose of preferring an existing creditor, it is valid under the New York law, and that if the New Jersey statute applies, the defendant was not, at the time the pledge was made, insolvent to the knowledge of Tolman.

*First.* The sixty-fourth section of the Corporation act (*2 Comp. Stat. p. 1638*) applies to a foreign corporation doing business in this state. It was so held by Vice-Chancellor Stevenson in *Agnew Co.* v. *Paterson Board of Education, 83 N. J. Eq. 49* (at *p. 55*), and his determination upon this branch of the case was affirmed by the court of errors and appeals for the reasons he stated in *83 N. J. Eq.* (at *p. 339*). And see *Boehme* v. *Rall, 51 N. J. Eq. 541.* All of the assets of the corporation were in this state; its entire business was in this state; the pledge was of property within this state. The fact that the notes were delivered in New York, payable in New York, does not, I think, differentiate this case from those cited.

*Second.* Had the company actually suspended its ordinary business within the meaning of section 64 so that notice to Tolman is immaterial? At the time of the delivery of the notes and of the pledge, the company was insolvent in the sense that there was a general inability to meet pecuniary liabilities as they matured by means of either available assets or an honest use of credit (*67 N. J. Eq. 602; 84 N. J. Eq. 415; 85 N. J. Eq. 181*), as I will hereafter point out. And the company had suspended its business and was not about to resume the same in the sense that it had suspended payment of its pecuniary liabilities and was not about to resume such payment. *Fort Wayne Electric Co.* v. *Franklin Electric Light Co., 57 N. J. Eq. 7; Reinhardt* v. *Interstate Tel. Co., 71 N. J. Eq.* (at *p. 70*) ; *Catlin* v. *Vichachi Mining Co., 73 N. J. Eq. 286.*

The facts were present which would have warranted the court in appointing a receiver under section 65, but it does not necessarily follow that the words "actually suspended its ordinary business" in section 64 contemplate the same sort of suspension of business as indicated by the words "resumption of business" in section 65. The legislature was dealing in section 64 with the validity of transfers, &c., an entirely different subject-matter than that dealt with in section 65. Transfers, &c., are void if made (a) when the corporation is insolvent, or (b) after it has suspended its ordinary business for want of funds to carry on the same, or (c) if the transfer be made in contemplation of insolvency. A *bona fide* purchaser for value is saved if the transfer, &c., be made when the corporation be insolvent or if the transfer be made in contemplation of insolvency, if he have no notice, in the first instance, of the insolvency, and in the second instance, of the sale being made in contemplation of insolvency, provided always the sale shall have been made before the company shall have actually suspended its ordinary business. If the sale be made before the company has actually suspended its ordinary business then want of notice is material; if after, want of notice is immaterial. Actual suspension of business as used in this section imports more than a mere failure to meet maturing obligations as they accrue. The reasoning which in-

duced the court to hold that the words "resume its business" in the sixty-fifth section referred to a resumption of meeting maturing obligations does not apply. The statute contemplates an interruption of ordinary business operation evidenced by some objective features. In the case of banks a failure to meet maturing obligations would be an actual suspension of business because it would result in the immediate closing of the doors. In the case of manufacturing concerns, a cessation of manufacture. In any event there is required an interruption of the ordinary course of business other than a mere failure to meet maturing obligations. A consideration of the following cases leads to this conclusion: *Miller* v. *Gourley, 65 N. J. Eq. 237; Regina Music Box Co.* v. *Otto & Sons, 65 N. J. Eq. 582*: affirmed, *68 N. J. Eq. 802; Reed* v. *Helois Carbide Specialty Co., 64 N. J. Eq. 231; Bedford* v. *Newark Machine Co., 16 N. J. Eq. 117; Kinsola's Administrators* v. *The Cataract City Bank, 18 N. J. Eq. 158.* At the time the pledge was made the corporation had not actually suspended its business within the meaning of the statute.

*Third.* Was the company insolvent at the time the pledge was given and did Tolman have notice of such insolvency? "Insolvent" as used in the sixty-fourth section must be defined the same as "insolvent" as used in the sixty-fifth section, that is, a corporation is insolvent when there is a general inability to meet pecuniary liabilities as they mature, by means of either available assets or an honest use of credit. *Trust Co.* v. *Trustees of Wm. F. Fisher & Co., 67 N. J. Eq. 602; Wright* v. *American Finance and Securities Co., 84 N. J. Eq. 415; 85 N. J. Eq. 181.* Nevertheless, a corporation may, if temporarily in need of funds, pledge its assets if, by the pledge of such assets, moneys may be raised which will relieve it of its embarrassment and permit it to continue. *Reed* v. *Helois Carbide Specialty Co., 64 N. J. Eq. 231; Miller* v. *Gourley, 65 N. J. Eq. 237; Regina Music Box Co.* v. *Otto & Sons, 65 N. J. Eq. 582;* affirmed, *68 N. J. Eq. 802.* But it seems to me on the authority of *Cope* v. *Walton, 77 N. J. Eq. 512; 79 N. J. Eq. 165,* that at least it must appear, before a corporation insolvent, in the sense of laboring under a

general inability to pay maturing obligations, can make, for a present advance, a valid pledge of its assets to a person having knowledge of the condition, that the pledge is in pursuance of some financial scheme which it is reasonable to suppose will result in placing the corporation in a position of solvency as contemplated by the statute. And in this connection I point out that there is a great distinction between a general inability to meet maturing obligations and a temporary embarrassment.

At the time of the original transaction with Tolman in August, 1917, the company had past-due indebtedness in excess of $10,000; it actually owed more than $30,000; much of the past-due indebtedness existing in August, September and October, 1917, was in existence at the time of the appointment of the receiver on May 24th, 1918; it was not manufacturing; it was only experimenting; it had exhausted the ordinary means for raising money; its creditors were pressing; it needed money "for working capital." Through an advertisement through the medium of a broker its officers came in contact with Tolman, a money lender in New York. It arranged with Tolman for an advance of approximately $4,000 upon two sixty-day collateral notes to secure which there was pledged some forty-five thousand pounds of steel. Shortly thereafter it procured another loan from Tolman, approximately $4,300, for which it gave him a chattel mortgage to secure the sum of $5,000 upon its plant and machinery. Both the note and chattel mortgage were payable in sixty days. There was no scheme worked out by which provision was made for the payment either of the past-due indebtedness or of the notes and chattel mortgage when they should become due; there is no evidence that there was any expectation that the company could possibly be put in financial condition where it might meet either the amounts due upon the past-due indebtedness or the amounts due on the chattel mortgage and notes, nor do I think it was contemplated that either should be met. If it was so contemplated, then such contemplation was not based, so far as the evidence is concerned, upon any facts which would appeal to reasonable men. When the notes became due the company was unable to pay and thereupon another trans-

action took place between the officers of the company and Tolman, by which Tolman advanced an additional $300 and a sum which has been stated to be either $500 or $700, and a new collateral note for $5,800 was delivered; at the same time Tolman released from the storage warehouse three thousand pounds of steel and there was an endorsement made upon the note of a credit of $420; as part and parcel of the same transaction the old chattel mortgage was canceled and a new chattel mortgage executed for $6,000, payable at the rate of ninety days; at the time of this new transaction no plan was proposed by which the company was to be put upon its feet nor was it contemplated that the moneys raised should be used for the purpose of putting the corporation in a position to pay its maturing obligations. The most that can be said is that the officers of the company hoped that the money advanced by Tolman might enable them to complete their experiments so that they might have something which would put them in a position to negotiate with creditors. Tolman was, in fact, advancing "capital" at usurious rates, secured by a pledge of all the company's available assets. The company was not in need of funds to tide it over a temporary embarrassment. It was in need of working capital. There is no difficulty in this case with respect to notice. The evidence is that Tolman visited the plant, went over the bills and was made fully familiar with the entire financial situation. As consideration for his advance Tolman was to receive upwards of twenty per cent. In consideration of the advance of some $9,000 the corporation stripped itself of its available means of raising money. The notes and chattel mortgage were for short terms and not given in pursuance of any plan of financial rehabilitation. The case is essentially different from those dealt with in *Regina Music Box Co.* v. *Otto & Sons, Reed* v. *Helois Carbide Specialty Co.* and *Miller* v. *Gourley.* In *Cope* v. *Walton, 77 N. J. Eq. 512; 79 N. J. Eq. 165,* both this court and the court of errors and appeals, in a case where a present advance had been made and the assignment of a *chose in action* taken as security, and the moneys used by the corporation in the business of completing a contract, under which contract the moneys in dispute were earned, held that the assignee, hav-

ing knowledge of the insolvency of the corporation at the time the assignment was made, was barred from asserting his rights by virtue of the provisions of the sixty-fourth section. In that case the receiver was not appointed until seven months after the making of the assignment.

My conclusion is that the corporation at the time the pledge was made was insolvent to the knowledge of Tolman and that the pledge is void as against the receiver.

I will advise an order so declaring and directing that the moneys be considered as a part of the estate, subject to distribution among creditors.